Date signed March 30, 2015



WENDELIN I. LIPP
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| Craig William Price, | : | Case No.: 14-13186-WIL |
| ArRee Price, | : | Chapter 7 |
| | : | |
| Debtors. | : | |

### MEMORANDUM OPINION

Before the Court are Washington County Teachers Federal Credit Union's Motion to Dismiss pursuant to 11 U.S.C. §§ 707(a) and (b) (the "Motion to Dismiss") and the Debtors' Opposition thereto. The Court conducted a trial on the Motion to Dismiss on December 1, 2014, at which the Court took the matter under advisement. Thereafter, the Court issued a Memorandum to Parties instructing the parties to file briefs addressing whether the presumption of abuse arises in the Debtors' bankruptcy case in light of the testimony and evidence presented at trial regarding the Debtors' monthly income and expenses. Both parties submitted briefs. The Court has considered the Motion to Dismiss, the Debtors' Opposition thereto, the evidence and testimony presented at trial and the post-trial submissions. For the following reasons, the Motion to Dismiss is granted.

I.    **Findings of Fact**

The following facts are relevant to the Court's decision and are either undisputed or supported by the evidence presented at trial.[1] The Debtors commenced the above-captioned bankruptcy case on March 3, 2014 (the "Petition Date"), upon their filing of a Voluntary Petition under Chapter 7 of the United States Bankruptcy Code (hereafter, the "Bankruptcy Code"). The Debtors filed their bankruptcy schedules and Statement of Financial Affairs with their bankruptcy petition. This is the Debtors' third bankruptcy filing since 2012. The "Notice of Prior Filing" entered in the instant case provides the following information regarding the Debtors' prior cases: "Case Number 12-24104, Chapter 13 filed in Maryland Bankruptcy Court on 07/31/2012, Dismissed for Failure to File Information on 03/22/2013; Case Number 13-16795, Chapter 13 filed in Maryland Bankruptcy Court on 04/18/2013, Dismissed for Other Reason on 12/24/2013." The same attorney represented the Debtors in all three bankruptcy cases and filed schedules for the Debtors in all three cases. The schedules filed in the instant case, the contents of which Movant asked this Court to take judicial notice of at trial, listed the amount of all claims on Schedules D and F as either "Unknown" or "0.00."[2]

The Debtors' Meeting of Creditors was held on April 28, 2014. Portions of the transcript from the Meeting of Creditors were admitted into evidence at trial as Movant's Exhibit No. 3. At the Meeting of Creditors, the Chapter 7 Trustee questioned why all claims on Debtors' Schedules

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

[2] Rule 201(c) of the Federal Rules of Evidence, made applicable to bankruptcy cases by Rule 9017 of the Federal Rules of Bankruptcy Procedure, permits bankruptcy courts to take judicial notice of facts not subject to reasonable dispute because the fact is either generally known within the court's jurisdiction or can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(c).

D and F were listed as zero.[3]  Debtors' counsel explained that his bankruptcy software downloaded the amounts directly from the credit bureau and he speculated that creditors had "zeroed out the balances" based on the Debtors' prior bankruptcy cases even though the Debtors did not receive a discharge in either prior case.[4]  In addition to the inaccuracies on Schedules D and F, Debtors' counsel stated at the Meeting of Creditors that Debtors' Schedule J (monthly expenses) was overstated by at least $559.95.  At the conclusion of the Meeting of Creditors, the Trustee instructed the Debtors to file amended schedules within one week and information regarding Mr. Price's monthly travel reimbursements from his employer within two weeks.

Additional omissions from the Debtors' schedules were revealed at trial.  Most notably, the Debtors did not include on their Schedule I (monthly income) expense reimbursements received on a monthly basis from Mr. Price's employer via direct deposit.  Mr. Price received a reimbursement every month for the three years preceding the instant bankruptcy filing, with the average monthly reimbursement being $1,890.45 in 2013.  *See* Movant's Exhibit Nos. 1 and 2.  The average reimbursement for the first two months of 2014 was $2,362.64.  *See* Movant's Exhibit Nos. 1 and 2.  The Debtors did not consider the reimbursements "taxable income" required to be disclosed on either their bankruptcy schedules or their Chapter 7 Statement of

---

[3] The Trustee made the following observation at the Meeting of Creditors: "These are the least helpful schedules ever in the history of the universe since they have no numbers in them…."  *See* Movant's Exhibit No. 3.

[4] Debtors' counsel further explained at trial that "a lot of the debt" was listed as zero on the Debtors' schedules because counsel was concerned with possible credit reporting violations that he had not analyzed prior to filing the instant case.  The Court noted that any such causes of action would have required disclosure on Schedule B as an asset of the bankruptcy estate.  The Court notes that Debtors' Schedule B does not list any causes of action against any creditors.

Current Monthly Income and Means Test Calculations (the "Form B22A").[5] Mr. Price testified that his average monthly expenses for gasoline and vehicle maintenance exceed the monthly mileage reimbursement he receives from his employer. No evidence was presented at trial to substantiate Mr. Price's contention. Mrs. Price testified that she ceased working in August of 2013 (prior to the filing of the instant bankruptcy case) for unspecified "medical reasons." Mrs. Price is neither currently employed nor seeking employment due to "medical reasons." No medical records were admitted into evidence at trial so the Court is unable to ascertain the nature and extent of Mrs. Price's medical condition or determine whether she will be able to seek employment in the near future.

On June 9, 2014, the Washington County Teachers Federal Credit Union ("Movant") filed the Motion to Dismiss. The Debtors filed their Opposition to the Motion to Dismiss on June 25, 2014. On August 29, 2014, the Chapter 7 Trustee appointed to the Debtors' bankruptcy case filed a Motion to Compel Amendment of Bankruptcy Schedules (the "Motion to Compel"). The Motion to Compel was granted on September 23, 2014, over the Debtors' Opposition. On October 6, 2014, the Debtors filed Amended Schedules D, E, F, I and J. At trial, the Court took judicial notice of the contents of the Motion to Compel, the Opposition thereto, the Debtors' amended schedules and the Debtors' schedules filed in their previous bankruptcy cases. The majority of claims listed on the Debtors' Amended Schedule F are for an "unknown" amount, including six claims held by Movant that Debtors listed as "disputed" and "subject to setoff." Those claims that are scheduled with an actual dollar amount total $36,340.52. This is in stark

---

[5] The financial information disclosed on Form B22A is determinative of whether the presumption of abuse arises in a particular bankruptcy case. Although the Court was not timely asked to take judicial notice of the Debtors' Form B22A at trial, Debtors' counsel conceded that the Debtors' Form B22A failed to account for the monthly reimbursements from Mr. Price's employer and counsel requested leave to amend the Debtors' Form B22A. The Debtors submitted an amended Form B22A with their post-trial brief. The Court could not consider the amended Form B22A or determine whether the presumption of abuse arises under the amended Form B22A because it was submitted after trial not admitted into evidence.

contrast to the Schedule F filed in the Debtors' prior Chapter 13 case, which listed approximately $185,000.00 in unsecured claims.   Although Mr. Price testified at trial that his current annual income is $125,000.00, both the Debtors' initial Schedule I and Amended Schedule I reflect gross annual income of $115,384.80 (or $9,615.40 a month).   The Debtors' Amended Schedule J reflects an increase in total monthly expenses from $7,472.90 to $8,615.16.   Most notably, their Amended Schedule J reflects that "childcare and children's education costs" increased from $0.00 to $800.00; "food and housekeeping supplies" increased from $900.00 to $1,600.00; "electricity, heat, natural gas" increased from $600.00 to $792.00; tax payments increased from $0.00 to $300.00; "medical and dental expenses" increased from $100.00 to $475.00; cable increased from $199.00 to $256.21[6]; and "clothing, laundry, and dry cleaning" increased from $100.00 to $180.00.   The Amended Schedule J also reflects some reduced expenses, namely: "transportation" decreased from $650.00 to $0.00; the overstated $559.95 was omitted; and "water, sewer, garbage collection" decreased from $125.00 to $0.00.   Nearly every expense on the Debtors' Amended Schedule J was changed from the original Schedule J, resulting in a total increase of $1,142.26, despite the omission of the $559.95 overstated expense.[7]   There was no testimony or other evidence presented at trial explaining the substantial increases reflected in the Amended Schedule J.

As of the Meeting of Creditors, the Debtors had entered into a new residential lease that cost $200.00 less per month than the rental payment reflected in the Debtors' Schedule J and

---

[6] Mr. Price testified at the Meeting of Creditors that the Debtors' pay $200.00 a month for television service.   Despite this testimony, Debtors' Amended Schedule J includes a monthly expense of $256.21 for TV-DirecTv.

[7] The original Schedule J and the Amended Schedule J both reflect monthly expenses of $2,600.00 for rent, $50.00 for renter's insurance, and $100.00 for home maintenance.   Cable/Internet, vehicle insurance, and the three car payments also remained the same.

Amended Schedule J. Also as of the Meeting of Creditors, the Debtors had agreed to surrender their Harley Davidson, which cost $80.00 per month plus $69.00 a month to insure. At trial, Mr. Price testified that they stopped making payments on the Harley Davidson when the Debtors filed their Chapter 7 petition. He further testified that they still maintained insurance on the motorcycle and his counsel explained this was because the motorcycle was still in the Debtors' possession. As of the trial, the Debtors' Chrysler 300 had been repossessed, which cost $201.13 per month per Debtors' Schedule J and Amended Schedule J. None of these changes were reflected in the Debtors' Amended Schedule J. As of the issuance of this Memorandum, the Debtors have failed to update their address of record.

## II.   Analysis

The Motion to Dismiss seeks dismissal under 11 U.S.C. §§ 707(a) and (b), although any alleged prejudice to creditors by the prosecution of this case was included in Movant's analysis under Section 707(b)(3) as opposed to separately under Section 707(a).[8]  Accordingly, the Court's analysis will begin with the abuse provision of Section 707(b), which provides, in relevant part:

> (b)(1) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

---

[8] 11 U.S.C.A. § 707(a) provides, in relevant part:
  The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including--
    (1) unreasonable delay by the debtor that is prejudicial to creditors[.]

6

11 U.S.C. § 707(b)(1).[9]   Here, it is undisputed that the debts in this case are primarily consumer debts.   Thus, the dispute is whether the instant filing is an abuse of the Bankruptcy Code.

Section 707(b)(3) provides guidance on when the granting of relief would be considered abusive where the presumption of abuse does not arise or is rebutted.   That subsection provides:

> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).   Although the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") lowered the standard under Section 707(b) from "substantial abuse" to "abuse," pre-BAPCPA cases are still instructive for interpreting Section 707(b)(3) and defining "totality of the circumstances."   *In re Crink*, 402 B.R. 159, 169 (Bankr. M.D.N.C. 2009).   In *Green v. Staples (In re Green),* 934 F.2d 568 (4th Cir.1991), the United States Court of Appeals for the Fourth Circuit set forth several factors for courts to evaluate when deciding whether to dismiss a case as abusive based on the "totality of the circumstances."   The *Green* factors are:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

---

[9] "Section 707(b)(2), also known as the 'means test,' provides a presumption of 'abuse' if a debtor's disposable income over 60 months exceeds a threshold amount."   *In re Crink*, 402 B.R. 159, 166 (Bankr. M.D.N.C. 2009).   In this case, the docket reflects that the presumption of abuse did not arise so Section 707(b)(2) is not applicable to the Court's analysis.   The Debtors' Form B22A was not admitted into evidence at trial and could not be considered by the Court.   Insufficient evidence was presented to determine whether the Debtors would have passed the "means test" had it been prepared accurately.

7

    (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

    (3) Whether the debtor's proposed family budget is excessive or unreasonable;

    (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

    (5) Whether the petition was filed in good faith.

*Id.* "Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors." *Id.* Although courts disagree on whether an ability to repay one's debt, by itself, constitutes cause for dismissal under Section 707(b), the Fourth Circuit has considered a debtor's ability to repay creditors when analyzing the totality of a debtor's financial circumstances. *See Calhoun v. U.S. Trustee*, 650 F.3d 338 (4th Cir. 2011); *see also In re Fox*, 521 B.R. 520, 528 (Bankr. D. Md. 2014)(recognizing that there has been disagreement among lower courts in the Fourth Circuit concerning whether a debtor's ability to pay creditors standing alone is sufficient to warrant dismissal for abuse). As stated by one Bankruptcy Court, "[i]t is difficult to envision a situation where the totality of a bankruptcy debtor's financial situation does not include the debtor's ability to repay her debts." *In re Crink*, 402 B.R. at 167. The moving party bears the burden of proving abuse under Section 707(b)(3) by a preponderance of the evidence. *See In re Perelman*, 419 B.R. 168, 178 (Bankr. E.D.N.Y. 2009). Once a *prima facie* case is established by the moving party, the burden of going forward with sufficient evidence to controvert the *prima facie* case shifts to the debtor. *Id.*

An appropriate method to establish whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid through a hypothetical Chapter 13 plan, with the greater the ability to pay the more likely the finding of abuse. *In re Crink,* 402 B.R. at 172-173. Court's evaluate a debtor's ability to pay by looking to the debtor's future income and expenses, as well as the debtor's monthly income and expenses as disclosed in Schedules I and J. *Id.* at 173. Courts may further consider whether the expenses claimed by a debtor can be reduced significantly without depriving the debtor or the debtor's dependents of "adequate food, clothing, shelter, or other necessities of life." *Id.* Section 101(10A)(A) of the Bankruptcy Code defines "current monthly income" as "the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income...." 11 U.S.C. § 101(10A)(A). "[F]ull and accurate disclosure of all income, deductions therefrom and expenses, whether debtors deem them necessary or unnecessary expenses, is required." *In re McNichols*, 255 B.R. 857, 877 (Bankr. N.D. Ill. 2000). As for sources of income required to be disclosed on Schedule I, in light of the Bankruptcy Code's broad definition of "current monthly income," this Court agrees that mileage reimbursements from a debtor's employer are considered income for purposes of Section 101(10A)(A). *See In re Tinsley*, 428 B.R. 689, 692 (Bankr. W.D. Va. 2010)(*citing In re Martin,* 189 B.R. 619 (Bankr. E.D. Va. 1995) and *In re Hornung,* 425 B.R. 242 (Bankr. M.D.N.C. 2010)).[10]

A debtor's bad faith provides an additional basis for a finding of abuse under Section 707(b). Once the movant puts the debtor's good faith at issue, the burden shifts to the debtor to establish his good faith. *See In re Hardigan*, 490 B.R. 437, 444 (Bankr. S.D. Ga. 2013). "Good faith must be determined on a case-by-case basis, considering whether the provisions, purpose, or

---

[10] Although *Tinsley* was a Chapter 13 case, its holding is not limited to the Chapter 13 context since it specifically addresses what should be included on Schedules I and J. The *Hornung* Court reached the same conclusion in the Chapter 7 context. *In re Hornung,* 425 B.R. at 253.

9

spirit of the bankruptcy laws have been abused." *Id.*  Material misrepresentations and omissions in a debtor's schedules are factors that a court may consider in determining whether dismissal for bad faith is appropriate under Section 707(b)(3)(A).  *See In re Fox*, 521 B.R. at 532.  Debtors have an ongoing and independent duty to provide accurate and complete information on their schedules regardless of whether they were assisted by counsel in preparing their schedules.  *See In re Barrows*, 399 B.R. 506, 511 (Bankr. D. Minn. 2009).  "The purpose of the schedules is to ensure that there is adequate information available to the debtor's creditors—there should be no independent duty placed upon the creditors to conduct an investigation to ensure that the information in the schedules and statements is true, accurate and complete."  *In re Seung Chan Park*, 480 B.R. 627, 639 (Bankr. D. Md. 2012).  "To allow [a debtor] to use his discretion in determining the relevant information to disclose would create an end-run around this strictly crafted system."  *Id. (quoting In re Weldon*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995)).  "Creditors should not have to 'drag the truth' from the debtor and the debtor should be required to abide by the 'cardinal rule: when in doubt, disclose.'" *Id. (quoting In re Halishak,* 337 B.R. 620, 630 (Bankr. N.D. Ohio 2005)).  In addition to honestly and accurately disclosing assets, debtors are required to cooperate with the bankruptcy trustee and amend their bankruptcy schedules as soon as practicable after learning of any inaccuracies or omissions.  *See Bauer v. Iannacone (In re Bauer)*, 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003); *see also In re Evinger*, 354 B.R. 850, 854 (Bankr. W.D. Ark. 2006).  Failure to abide by any of these duties may be evidence of bad faith under Section 707(b).

Applying the *Green* factors to this case, including consideration of the Debtors' ability to repay their debts, warrants a finding of abuse under Section 707(b)(3).  The first *Green* factor—whether the bankruptcy petition was filed because of sudden illness, calamity, disability

or unemployment—was briefly addressed at trial. Movant argued that this was Debtors' third bankruptcy case, the first two of which were filed while Mrs. Price was still employed so her unemployment did not precipitate the current case. The Court disagrees with Movant. Mrs. Price testified that she ceased working due to unspecified medical conditions. Mr. Price testified that they could not afford the Chapter 13 payments in their prior case after Mrs. Price was forced to resign. He further testified that they tried "to work through it" but the Debtors ultimately decided to file their Chapter 7 petition. Although the record is clear that the Debtors were not meeting their financial obligations prior to and after Mrs. Price ceased working, the trial testimony established that Mrs. Price's unemployment, caused by her medical condition, was a precipitating factor in the filing of their current Chapter 7 case. Nevertheless, there was no testimony or other evidence regarding the extent of Mrs. Price's medical condition or whether she could return to work in the near future. Assessing these facts, the Court does not find that this factor weighs in favor of or against a finding of abuse.

The second *Green* factor— whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay—was not disputed by Movant and therefore, does not weigh in favor of dismissal. Rather, Movant's case focused on the remaining *Green* factors, namely: inaccuracies in the Debtors' schedules; the omission of Mr. Price's monthly reimbursements from Schedule I; the Debtors' failure to timely amend their schedules as instructed by the Trustee at the Meeting of Creditors; the reasonableness of the Debtors' monthly expenses; and the Debtors' lack of cooperation in all three of their bankruptcy cases.

The third *Green* factor is whether the debtor's proposed family budget is excessive or unreasonable. Although Movant argued that certain monthly expenses reflected in the Debtors' schedules are excessive, the Debtors' Form B22A was not admitted into evidence, which sets forth

11

the national and local standards for certain deductions from income.   Nor was any independent evidence of the reasonableness of the Debtors' expenses admitted into evidence.   Nevertheless, the Court is permitted to take judicial notice of the Census Bureau and IRS Data regarding national and local standards for certain expenses.[11]   *See Fecek v. Sallie Mae, Inc. (In re Fecek)*, No. 12-13062-JMC-7, 2014 WL 1329414, *5 (Bankr. S.D. Ind. March 31, 2014).   In so doing, it is clear that several of the Debtors' monthly expenses are excessive and could be "reduced significantly without depriving the debtor or the debtor's dependents of 'adequate food, clothing, shelter, or other necessities of life.'"   *In re Crink*, 402 B.R. at 172.   Most notably, the IRS National Standards for food and housekeeping supplies for a family of five (as of the Petition Date) is no more than $1,132.00 whereas the Debtors' Amended Schedule J reflects a monthly expense of $1,600.00 for food and housekeeping supplies.   The United States Trustee's Local Housing and Utility Standards[12] for Washington County, Maryland in effect as of the Petition Date were $1,632.00 per month for mortgage/rent and $589.00 per month for utilities (for a total of $2,221.00).   The Debtors' Amended Schedule J reflects the following monthly expenses: $2,600.00 for rent; $50.00 for renter's insurance; $100.00 for home maintenance; $792.00 for electricity, heat and natural gas; and a combined $696.21 for monthly cable, Internet and phone services.   These expenses total $4,238.21—nearly double the local standards.   Clearly, this factor weighs in favor of a finding of abuse and the Debtors failed to present evidence to refute this finding.

The next element is whether the debtor's schedules and statement of current income and

---

[11] The website for the United States Trustee Program, the component of the Department of Justice that oversees the administration of bankruptcy cases and private trustees, contains the national and local standards for median family income and certain expenses.

[12] Housing and Utilities standards include mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, telephone, cell phone, internet, and cable.

12

expenses reasonably and accurately reflect the Debtors' true financial condition. This element offers the most weight toward a finding of abuse. There was a lot of focus at trial on the monthly reimbursements received by Mr. Price. The Debtors were adamant that the reimbursements do not qualify as income required to be disclosed in their bankruptcy schedules or in their Form B22A. Mr. Price testified that he submits an expense form to his employer on a monthly basis and his employer reimburses him for mileage based on a "federal reimbursement rate." Reimbursements are made via direct deposit. Mr. Price further testified that on a monthly average, his expenses for gasoline and vehicle maintenance exceed the expense reimbursement he receives from his employer. No documentary evidence was presented to support Mr. Price's assertion that his travel expenses exceed his expense reimbursements, and the Debtors offered no legal basis in the bankruptcy context for excluding the reimbursements from their bankruptcy schedules.[13] Instead, Debtors' counsel explained at trial that the Debtors amended their Schedule J to "reflect a lower transportation cost because I wanted to make sure that the Court did not think that we were somehow trying to misrepresent or miscalculate numbers in an effort to get into bankruptcy." In other words, instead of claiming the expense reimbursements as income on Schedule I and Mr. Price's transportation costs as an expense on Schedule J, the Debtors opted to exclude both.

At the conclusion of the trial, the Court directed the parties to file post-trial briefs addressing whether the presumption of abuse arises in the Debtors' bankruptcy case after accounting for the changes to the Debtors' monthly income and expenses reflected in their amended schedules and as testified to at trial, including Mr. Price's monthly reimbursements. In

---

[13] The only exhibit the Debtors admitted into evidence was an IRS publication regarding the taxability of business travel reimbursements. The IRS publication has no bearing on whether a debtor's business reimbursements constitute a form of income required to be disclosed in a debtor's bankruptcy schedules.

the Debtors' post-trial brief, the Debtors argue that the reimbursements should be treated as "business income" with respect to their Form B22A, and that only the difference between the reimbursements and corresponding expenses need to be disclosed for purposes of the means test.[14] In their supplemental brief, the Debtors argue that because the Trustee has not objected to the Debtors' amended schedules, then the inquiry regarding whether the expense reimbursements needed to be disclosed should cease. The Debtors' argument is without merit. The Court will not presume what investigation the Trustee conducted into the Debtors' finances after the filing of their amended schedules. It is entirely possible that the Trustee did not pursue any action against the Debtors because Movant was already prosecuting its Motion to Dismiss. Either way, the Trustee's action or inaction is irrelevant to the issue before the Court.

Despite the post-trial briefs, it is impossible for the Court to determine whether the presumption of abuse would have arisen in this case had the Debtors accurately reported their income and expenses, including Mr. Price's monthly reimbursements and omitted transportation expenses. The Debtors' Form B22A was not admitted into evidence so the Court cannot compare the figures reported in the filed Form B22A with the income and expenses disclosed on their amended schedules and as testified to by the Debtors. The Court simply has insufficient information to conduct a means test analysis. Thus, the Court's analysis is based on Section 707(b)(3) and whether the failure to include the travel reimbursements is evidence of abuse. In

---

[14] Debtors attach a completed Form B22A to their response and argue that because it indicates that the presumption of abuse does not arise, Movant is precluded from looking to Debtors' Schedules I and J to argue that this case is abusive. Debtors rely on *In re Walker*, 381 B.R. 620 (Bankr. M.D. Pa. 2008), where the United States Bankruptcy Court for the Middle District of Pennsylvania applied the doctrine of negative implication to find that because a debtor's income and expenses are analyzed as part of the means test under Section 707(b)(2), a debtor's ability to repay his creditors based on his bankruptcy schedules may not be considered under Section 707(b)(3). In addition to not being binding on this Court, the cited holding in *Walker* was expressly rejected by the same Court in *In re Lanza*, 450 B.R. 81, 86 (Bankr. M.D. Pa. 2011). Moreover, the completed Form B22A attached to the Debtors' post-trial brief was not admitted into evidence at trial and cannot be considered by the Court.

light of the Code's broad definition of "current monthly income," this Court agrees with those Courts finding that Mr. Price's monthly reimbursements are considered income for purposes of Schedule I.  *See In re Tinsley*, 428 B.R. 689.   The Debtors should have included the average reimbursement amount on Schedule I and then listed any travel-related expenses incurred by Mr. Price on Schedule J.   Anything less falls short of "full and accurate disclosure" of the Debtors' finances, which is essential to the bankruptcy process.   The Debtors cannot selectively disclose which sources of income and which expenses to include in their schedules.   To do so makes it impossible for the Trustee and creditors to ascertain the Debtors' true financial condition, as contemplated by the fourth *Green* factor.   The Debtors' assertion that they excluded their transportation costs to balance out the omission of the travel reimbursements is further evidence that they were manipulating their schedules.   Like every other monthly expense, the Debtors' transportation costs at the time of filing needed to be ascertained and accurately accounted for in their schedules.

In addition to the omission of Mr. Price's travel reimbursements and expenses, the substantial changes to the Debtors' expenses reflected in their Amended Schedule J casts further doubt as to the accuracy of the Debtors' schedules.   As set forth above, the Debtors' initial schedules and amended schedules both reflect the Debtors' financial condition as of the filing of their bankruptcy case.[15]   Nevertheless, nearly every itemized expense on the Debtors' Amended Schedule J was changed from their original Schedule J to show an overall increase in monthly expenses of $1,142.26 —despite the exclusion of the "overstated" $559.95 car payment that was

---

[15] The Court notes that sometimes amended schedules reflect post-petition changes to a debtor's finances.  That is not the case here.   The Amended Schedule J still reflects two vehicle payments that Debtors were no longer making, the same amount of insurance despite having two fewer vehicles, and reflects the same housing payment despite Mr. Price's testimony that they had moved to a new rental property by the time of the Meeting of Creditors.   Moreover, the Debtors' Amended Schedule I reflects the same income notwithstanding Mr. Price's testimony that his current annual income had increased to $125,000.00.

15

inadvertently included on the original Schedule J. The Amended Schedule J reflects that childcare and children's education costs increased from $0.00 to $800.00; food and housekeeping supplies increased from $900.00 to $1,600.00; electricity, heat, natural gas increased from $600.00 to $792.00; tax payments increased from $0.00 to $300.00; and medical and dental expenses increased from $100.00 to $475.00. These are substantial increases that were neither explained nor supported by any evidence at trial despite being challenged by Movant, particularly the increased childcare costs. As Movant pointed out, the schedules filed in the Debtors' prior bankruptcy cases did not contain any childcare expenses and that was while both the Debtors were employed. The Amended Schedule J also reflects an increase in cable costs from $199.00 to $256.21— despite Mr. Price's testimony at the meeting of creditors that the Debtors' pay $200.00 a month for television service. Although a difference of $56.21 is relatively insignificant, it is significant here because it directly contradicts sworn testimony. Taken together, the changes reflected in the Amended Schedule J appear to be a transparent attempt to conceal the true nature of the Debtors' financial condition and strongly support a finding of abuse that was not controverted by the Debtors.

The next consideration is whether the Debtors' indebtedness could be repaid through a hypothetical Chapter 13 plan. Again, the incomplete nature of the Debtors' schedules makes this determination impossible, which does not weigh in their favor. The majority of the claims included on the Debtors' Amended Schedule F were listed in an "unknown" amount. Those claims that are scheduled with an actual dollar amount total $36,340.52. The Debtors' Amended Schedule J shows monthly net income of negative $1,543.88. Even accepting the Debtors' expenses at face value, Mr. Price's average monthly reimbursement from 2013 and the first two months of 2014 was between $1,890.45 and $2,362.64, which brings the Debtors' net income to

between $346.57 and $818.76. Mr. Price testified that his transportation expenses exceed the amount of his monthly reimbursement, however, this was not supported by the Debtors' Schedules and no evidence was presented at trial to substantiate Mr. Price's statement. Further, Mr. Price's annual income has increased by approximately $10,000.00. Applying an estimated 25% tax withholding rate, that is an increase an income of approximately $625.00 per month. Additionally, the Debtors no longer have $281.13 in car payments (for the Harley Davidson and Chrysler 300) and their vehicle insurance should be reduced by at least $69.00 per month by the surrender of the Harley, which makes an additional $350.13 available per month to repay creditors.[16] These savings, combined with Mr. Price's average monthly reimbursement and increased income, would enable the Debtors to repay a substantial portion of their scheduled claims through a Chapter 13 plan. Thus, this factor also weighs in favor of a finding of abuse.

The final *Green* factor is whether the petition was filed in good faith. This overlaps with a finding of bad faith under Section 707(b)(3)(A) and will be discussed together. Movant asserts that the inaccuracies in the Debtors' Schedules and their lack of cooperation in all three of their bankruptcy cases are indicative of their bad faith. Debtors counter that their conduct does not rise to the level of concealment or misrepresentation and that it is obvious that their debts greatly exceed their ability to repay. The Court finds sufficient evidence of bad faith to warrant dismissal of this case under Section 707(b)(3). The Debtors' initial schedules were woefully inaccurate. Not only were claims not properly scheduled, the Debtors omitted a significant source of income in the form of Mr. Price's travel reimbursements. Moreover, despite instructions from the Trustee to file amended schedules within one week of the Meeting of Creditors, the amended schedules were not filed until October 6, 2014—nearly six months after the Meeting of Creditors

---

[16] Mr. Price testified that their Chrysler 300 was repossessed post-petition. Thus, the Debtors' monthly vehicle insurance should be reduced by more than the $69.00 attributable to the Harley Davidson.

and after entry of the Order Granting Motion to Compel Amendment of Bankruptcy Schedules. Finally, the Debtors' amended schedules still made it impossible for creditors and parties-in-interest to ascertain the Debtors' true financial condition. Regardless of whether the schedules were prepared with the assistance of counsel, the Debtors had a continuing and independent duty to ensure their accuracy and to cooperate with the Trustee. *See In re Barrows*, 399 B.R. at 511. Based on these facts, the Court finds that the Debtors failed to establish their good faith in filing the instant case.

### III.     Conclusion

In sum, the standard for granting a motion to dismiss under Section 707(b) is "abuse" of the Bankruptcy Code. Upon consideration of the factors set forth in *In re Green* to determine whether abuse exists based on the totality of the Debtors' financial circumstances, the Court finds that Movant established a *prima facie* case that allowing this case to continue in Chapter 7 would be an abuse of the Bankruptcy Code under Section 707(b)(3)(B). The Debtors' Schedules are significantly inaccurate and concealed the true nature of the Debtors' financial condition; certain expenses in the Debtors' budget are excessive; the Debtors failed to establish that they filed this case in good faith, and the Debtors have the ability to repay a substantial portion of their scheduled claims through a Chapter 13 Plan.[17] The Debtors failed to present sufficient evidence to overcome Movant's case. The Court's finding of bad faith constitutes an alternative basis for dismissal under Section 707(b)(3)(A). An Order consistent with this memorandum will be entered contemporaneously herewith.

---

[17] The Schedule F filed in the Debtors' prior Chapter 13 case lists approximately $185,000 in unsecured claims. If the Debtors had reflected these claims in their current case, they could have argued that any distribution to unsecured creditors would be minimal. They did not and could not argue this point because their schedules were inaccurate and this Court cannot assume facts not in the record. The Court notes, however, that even if the Debtors' Schedule F reflected significantly more claims, it would not change the result herein because the other *Green* factors weigh against the Debtors.

cc: Debtors
    Debtors' Counsel
    Chapter 7 Trustee
    United States Trustee
    Counsel for Washington County Teacher's Federal Credit Union - Douglas H. Seitz, Esq.
    All Creditors and Parties-in-Interest

**END OF MEMORANDUM**